Filed 5/9/16; pub. order 6/7/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| RENEE RONDON,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>HENNESSY INDUSTRIES, INC.,<br><br>      Defendant and Respondent. | A141686 & A142411<br><br>(Alameda County<br>Super. Ct. No. RG13695174) |

**I.**

**INTRODUCTION**

Appellant Renee Rondon, as the successor-in-interest to her late husband Frank Rondon, appeals the trial court's award of summary judgment in favor of Hennessy Industries, Inc. (Hennessy). Frank Rondon developed mesothelioma as the result of exposure to asbestos while working as a mechanic. Mr. Rondon brought claims for strict liability and negligence against Hennessy, alleging that its brake arcing machines released asbestos dust that caused him injury when he used them to grind standard brake linings. Hennessy moved for summary judgment, arguing it was not liable as a matter of law because its brake arcing machines did not contain asbestos, Hennessy did not produce the asbestos-containing brakes linings, and its machines were not used exclusively to grind brake linings containing asbestos. The trial court found there was no triable issue of fact and granted the motion.

1

We reverse, concluding that the recent decision from the Second District Court of Appeal in *Sherman v. Hennessy Industries, Inc.* (2015) 237 Cal.App.4th 1133 (*Sherman*) is directly on point, and is persuasive. That opinion held that the proper test is not the "exclusive use" standard argued by Hennessy and relied on by the trial court, but whether the "inevitable use" of Hennessy's machines would expose a worker like Rondon to asbestos dust absent safety protection or adequate warning. Because Rondon produced sufficient evidence to raise a triable issue of fact as to whether the "inevitable use" standard was met, the trial court erred in granting summary judgment. Accordingly, we reverse.

## II.
## FACTUAL AND PROCEDURAL BACKGROUND

Rondon's complaint alleged that Hennessy, through its predecessor Ammco Tools, Inc. (collectively Hennessy), manufactured and supplied brake arcing machines used to grind asbestos brakes.[1] Rondon used Hennessy's machines while working as a mechanic from approximately 1965 to 1988. The complaint alleged Hennessy is liable under both negligence and strict liability theories because the grinders "had no other function than to grind asbestos-containing brake linings."

Hennessy's grinders themselves did not contain asbestos. The grinders were designed to reshape the friction material of a brake shoe. When the grinder came into contact with an asbestos-containing brake shoe, it released asbestos into the air. From the 1950's through the 1970's, Hennessy's machines were designed to be used on standard sized drum brakes for light trucks and passenger vehicles.

Hennessy filed a summary judgment motion arguing there was no dispute of material fact that Hennessy never manufactured, distributed or designed an asbestos-containing product. Further, Hennessy's machines were not designed to be used exclusively with asbestos-containing products and were used on non-asbestos brakes. In

---

[1] The parties and the witnesses refer to the brake arcing machines in the colloquial as "grinders," and we do as well.

support of its motion, Hennessy submitted the declaration of mechanic and mechanical engineer Russell Darnell, Ph.D. Dr. Darnell stated he had personally installed non-asbestos metallic brake shoe linings in the 1960's and 1970's. "These metallic brake linings were regularly seen and used by mechanics such as myself (including myself) on vehicles, including vehicles such as Corvettes, GTs, 'SS', and similar domestically available sports cars and performance-type vehicles, known as 'muscle' cars, which became widely popular during the 1960's and 1970's in the United States." He stated Hennessy grinders were used on non-asbestos brakes during the 1960's and 1970's.

Craig Mountz, a product engineer who had been employed by Hennessy since 1975, also submitted a declaration about the use of the grinders on non-asbestos brakes. He stated Hennessy grinders did not contain asbestos. Hennessy "brake shoe arcing machines are designed to reshape the friction material of a brake shoe (brake lining), regardless of the brake shoe's composition." Hennessy "brake shoe arcing machines were not specifically designed or intended to be used solely with asbestos-containing brake linings, or any other type of brake shoe lining." Hennessy designed additional abrasives to better tailor its machines to different brake linings and created a grit abrasive for non-asbestos metallic brakes. "Although the high performance grit would last longer than the standard grit in high volume situations involving metallic and high-performance linings, both the standard grit and the high performance grit were capable of and could in fact arc metallic and high-performance brake linings."

In arguing it was entitled to summary judgment as a matter of law, Hennessy distinguished two recent decisions by our court: *Shields v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 782 (*Shields*), and *Bettencourt v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 1103 (*Bettencourt*). *Shields* and *Bettencourt* both held that allegations against Hennessy could survive motions for judgment on the pleadings because Hennessy could potentially be liable, as the grinders' sole, intended, and inevitable use was to grind asbestos-containing brakes. Unlike those cases, Hennessy argued that here, at the summary judgment stage where the court can consider evidence,

the undisputed facts show the grinders were not designed exclusively to be used with asbestos-containing brakes.

Rondon filed an opposition arguing that Hennessy's grinders substantially contributed to Rondon's asbestos exposure, citing *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335 (*O'Neil*) and *Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577 (*Tellez-Cordova*), because the intended function and "inevitable use" of Hennessy's grinders was to grind asbestos-containing brakes. Rondon presented the declaration of John Templin, an industrial hygienist, who opined that prior to 1980 "virtually all" drum brake materials contained asbestos. Non-asbestos brakes were in limited use. "I have not seen any reliable information to the effect that non-asbestos brake linings for drum brakes were commercially available for general or ordinary use prior to 1980 on automobiles or trucks." As part of his opinion, he relied on a 1986 Environmental Protection Agency report that 90 to 95 percent of brakes contained an asbestos lining. He opined that Rondon's work grinding brakes using Hennessy's machines resulted in the release of airborne asbestos fibers that exposed Rondon to significant concentrations of asbestos.

Rondon also submitted the deposition of Hennessey employee Craig Mountz. In his deposition, Mountz stated he did not know what percentage of brakes had asbestos lining but "our grinder grinds any kind of brakes, so it wouldn't matter if they banned asbestos and went to full metallic. It wouldn't have mattered to us from a machine standpoint." The standard grit would work on any brake type. Mountz explained a mechanic could use either grit on either kind of brake but "the grit for metallic brakes would last a little bit longer."

The action of the grinders released dust. Mountz agreed the main concern with the grinders was the release of that dust. Beginning in 1973, Hennessy provided an asbestos dust collector bag as standard equipment. The dust collector was for all kinds of dust, but the "big push in 1973" was to collect asbestos dust. Prior to 1973, the grinders did not have any warning about the dust or use of a dust bag.

4

**Summary Judgment Order**

The court granted Hennessy's motion for summary judgment, concluding it was impossible for Rondon to establish liability under the four key authorities: *O'Neil*, *Tellez-Cordova*, *Shields*, and *Bettencourt*. Rondon could not prove that its grinders were manufactured to be used exclusively and inevitably with asbestos-containing brakes. The court referred to the declaration of Dr. Darnell, who confirmed that several companies marketed non-asbestos brakes during the 1960's and 1970's. Darnell explained that although non-asbestos brakes were less frequently used, they were regularly seen on sports cars and other high performance "muscle" cars. Mountz testified that Hennessy grinders were used on standard brakes and that Hennessy offered three different grit belts for the grinders depending on the type of brakes. The court also noted that Rondon did not dispute that non-asbestos brakes were used, although their use was minimal.

In light of this evidence, the court concluded Rondon could not satisfy the requirements of *Tellez-Cordova* that the product " 'could only be used in a potentially injury-producing manner,' " or that the products intended use " 'inevitably creates a hazardous situation.' " Under *O'Neil*, Hennessy can be liable only if its grinders would be used exclusively on asbestos brakes, or if it was inevitable that the grinders' "exclusive use" would be to grind asbestos brakes. Unless those conditions are met, Hennessy could not be liable no matter how foreseeable it was that its grinders were used on asbestos brakes. The court distinguished *Shields* and *Bettencourt*, which involved motions for judgment on the pleadings, because here Hennessy had produced evidence to show the grinders were used on all brakes, not solely asbestos-containing brakes. Thus, there was no triable issue of fact.

The court did not directly address Rondon's negligence claim.

5

## III.

## DISCUSSION

**A.    *Standard of Review***

We summarized the well-known procedural rules and standard of review applicable to motions for summary judgment recently in *Ram's Gate Winery, LLC v. Roche* (2015) 235 Cal.App.4th 1071, 1078-1079 (*Ram's Gate Winery*):

"Summary judgment and summary adjudication provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute.  (Code Civ. Proc., § 437c, subd. (f)(2); *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843 . . . (*Aguilar*).)  A defendant moving for summary judgment or summary adjudication may demonstrate that the plaintiff's cause of action has no merit by showing that (1) one or more elements of the cause of action cannot be established, or (2) there is a complete defense to that cause of action.  (Code Civ. Proc., § 437c, subds. (f)(2), (p)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 849.)  This showing must be supported by evidence, such as affidavits, declarations, admissions, interrogatory answers, depositions, and matters of which judicial notice may be taken.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 850, 855; *Collin v. CalPortland Co*. (2014) 228 Cal.App.4th 582, 587 . . . .)

"After the defendant meets its threshold burden, the burden shifts to the plaintiff to present evidence showing that a triable issue of one or more material facts exists as to that cause of action or affirmative defense.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 850.)  The plaintiff may not simply rely on the allegations of its pleadings but, instead, must set forth the specific facts showing the existence of a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (p)(2).)  A triable issue of material fact exists if, and only if, the evidence reasonably permits the trier of fact to find the contested fact in favor of the plaintiff in accordance with the applicable standard of proof.  (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

"In ruling on the motion, the trial court views the evidence and inferences therefrom in the light most favorable to the opposing party.  (*Aguilar*, *supra*, 25 Cal.4th

6

at p. 843; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 . . . (*Saelzler*).) If the trial court concludes the evidence or inferences raise a triable issue of material fact, it must deny the defendant's motion. (*Aguilar*, *supra*, 25 Cal.4th at p. 843; *Saelzler*, *supra*, 25 Cal.4th at p. 768.) But the trial court must grant the defendant's motion if the papers show there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

" 'We review an order granting summary judgment or summary adjudication de novo. (*Aguilar*, *supra*, 25 Cal.4th at p. 860.) We independently examine the record to determine whether a triable issue of material fact exists. (*Saelzler*, *supra*, 25 Cal.4th at p. 767.) The trial court's stated reasons for granting summary judgment or summary adjudication are not binding on us because we review its ruling, not its rationale. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 . . . ["The sole question properly before us on review of the summary judgment is whether the judge reached the right result . . . whatever path he might have taken to get there . . . ."].)' (*Collin v. CalPortland Co.*, *supra*, 228 Cal.App.4th at p. 588, italics omitted)." (*Ram's Gate Winery*, *supra*, 235 Cal.App.4th at pp. 1078-1079.)

**B.**     *Strict Liability*

Strict liability is imposed for three types of product defects: manufacturing defects, design defects, and warning defects. (*Anderson v. Owens–Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995 (*Anderson*).) Rondon argues that Hennessy's machines caused the release of asbestos dust when used on standard brake linings and Hennessy failed to give adequate warning that its grinders released asbestos dust. Rondon also argued the grinders were defectively designed and did not protect users from airborne asbestos.

Throughout this litigation the parties and the trial court relied upon four key cases to evaluate the issues. We will discuss each of them in turn, along with the most recent case involving Hennessy grinders, *Sherman*, *supra*, 237 Cal.App.4th 1133.[2]

In *O'Neil*, our Supreme Court established the standard for evaluating manufacturer liability for injuries from an "adjacent product." (*O'Neil*, *supra*, 53 Cal.4th at pp. 342-343.) The court held "a product manufacturer may not be held liable in strict liability or negligence for harm caused by another manufacturer's product unless the defendant's own product contributed substantially to the harm, or the defendant participated substantially in creating a harmful combined use of the products." (*Id.* at p. 342.) In that case the defendant manufacturers manufactured valves and pumps used in Navy warships. (*Ibid.*) O'Neil was exposed to asbestos when replacement parts were used in conjunction with the pumps and valves. O'Neil argued the manufacturers should be held strictly liable because it was foreseeable workers would be exposed to asbestos in conjunction with their pumps and valves. (*Ibid.*) The manufacturers moved for nonsuit on all causes of action. (*Id.* at p. 346.)

"We conclude that defendants were not strictly liable for O'Neil's injuries because (a) any design defect in *defendants' products* was not a legal cause of injury to O'Neil, and (b) defendants had no duty to warn of risks arising from *other manufacturers' products*." (*O'Neil*, *supra*, 53 Cal.4th at p. 348, original italics.) The record did not support O'Neil's claim that the products were defective because they were " 'designed to be used' " with asbestos-containing components. (*Id.* at p. 350.) The pumps and valves could be used with either asbestos or non-asbestos gaskets and packing. (*Ibid.*) The products did not "require[] the use of asbestos components." (*Ibid.*)

---

[2] The Second District's decision in *Sherman* was issued after briefing in this case, although the parties did make reference to the pending *Sherman* appeal in their briefing. Since then, *Sherman* has been decided and, at this court's invitation, the parties have submitted supplemental briefs addressing the applicability of this recent decision to this appeal.

While manufacturers have a duty to warn consumers about the hazards inherent in their products (*Anderson*, *supra*, 53 Cal.3d at p. 1003), this duty does not extend to "hazards arising exclusively from *other* manufacturers' products." (*O'Neil*, *supra*, 53 Cal.4th at p. 351, original italics.)

The *O'Neil* court expressly distinguished *Tellez-Cordova*. In that earlier intermediate appellate court case, Tellez-Cordova developed lung disease from toxic dust released while using grinders and saws with abrasive discs. (*Tellez-Cordova*, *supra*, 129 Cal.App.4th at p. 579.) He sued the manufacturers of the power tools arguing they were specifically designed to be used with abrasive discs, and therefore it was reasonably foreseeable that toxic dust would be released during their intended use. (*Id.* at p. 580.) The trial court dismissed the complaint on a demurrer. (*Id.* at p. 579.)

On appeal the manufacturers argued that their tools could be used with a " 'universe of grindable products' " on all types of materials, but the court did not consider these facts at the demurrer stage and relied solely on the allegations in the complaint. (*Tellez-Cordova*, *supra*, 129 Cal.App.4th at p. 583.) In reversing the trial court's ruling, the appellate court noted that the complaint alleged that the application of the abrasive discs or wheels that produced toxic dust was the "inevitable use" of the tools. (*Id.* at p. 584.) The "allegation is that the tools had no function without the abrasives which disintegrated into toxic dust." (*Id.* at p. 585.)

The *O'Neil* court distinguished *Tellez-Cordova* on two grounds. First, the power tools in *Tellez-Cordova* could "*only* be used in a potentially injury-producing manner." (*O'Neil*, *supra*, 53 Cal.4th at p. 361, original italics.) The tools' "sole purpose" was to grind metals which would produce harmful dust. (*Ibid.*) To the contrary, in *O'Neil* the normal operation of the pumps and valves did not "inevitably cause the release of asbestos dust." (*Ibid.*) Second, the action of the power tools in *Tellez-Cordova* caused the release of harmful dust. (*Ibid.*) "Where the intended use of a product inevitably creates a hazardous situation, it is reasonable to expect the manufacturer to give warnings." (*Ibid.*) But manufacturers are not required to warn about all foreseeable harms that might occur in the vicinity of their products. (*O'Neil*, at p. 362.)

9

More recently this district issued two opinions, *Shields* and *Bettencourt*, applying *O'Neil* and *Tellez-Cordova*. Both cases involved claims against Hennessy that were dismissed by the trial court on motions for judgment on the pleadings. (*Shields*, *supra*, 205 Cal.App.4th 782; *Bettencourt*, *supra*, 205 Cal.App.4th 1103.) In *Shields*, the plaintiff was a mechanic who was diagnosed with lung cancer from asbestos exposure. He alleged Hennessy was liable in negligence and strict liability. (*Shields*, *supra*, 205 Cal.App.4th at p. 784.) The complaint alleged that Hennessy grinders were designed for use on cars and trucks with brakes that contained asbestos. (*Id.* at p. 786.) Hennessy " 'specifically designed [its] machines for grinding asbestos-containing brake linings [and they] had no other function than to grind asbestos-containing brake linings.' " This was their " 'only intended use.' " (*Id.* at p. 787.)

Division One of this court held that plaintiffs' causes of action were sufficient to survive a motion for judgment on the pleadings. (*Shields*, *supra*, 205 Cal.App.4th at p. 797.) Plaintiffs alleged that Hennessey designed and manufactured a machine whose only purpose and " ' "inevitable use" ' " was to grind brakes and at "all 'relevant' times" the brakes it was designed to grind contained asbestos. (*Ibid.*) The asbestos in the brake linings was " 'physically bound' " but became airborne due to the grinding action of Hennessy's machines. (*Ibid.*) "Hennessy's product was intended to be used with another product for the very activity that created a hazardous situation for the user. Its sole intended use was for an activity known to Hennessy to pose an unreasonable risk of harm." (*Ibid.*) "[T]he alleged sole and intended use of the brake arcing machine resulted in the release of contained asbestos particles. These allegations satisfy the circumscribed parameters of liability articulated by the Court of Appeal in *Tellez-Cordova* and approved by the Supreme Court in *O'Neil.*" (*Shields*, *supra*, 205 Cal.App.4th at p. 798.)

Division Five reached a similar result in *Bettencourt*. The trial court had granted judgment on the pleadings on strict liability and negligence causes of action against Hennessy. (*Bettencourt*, *supra*, 205 Cal.App.4th at p. 1111.) The complaint alleged that "[d]uring the periods relevant to this litigation, all brakeshoe [*sic*] linings used on automobiles, light trucks, and commercial trucks in the United States contained

10

asbestos." (*Id.* at p. 1108.) Hennessy's grinders were specifically designed to grind brakes and had no other function. (*Ibid.*) The allegation was the sole and intended purpose of Hennessy's grinders was to grind brakes and all brake shoe linings in the United States contained asbestos ,so "it was not only foreseeable that Hennessy's machines would be used to grind such linings, this was their inevitable use." (*Bettencourt*, *supra*, 205 Cal.App.4th at p. 1117.) This allegation is "indistinguishable from those *Tellez-Cordova* held sufficient to survive demurrer." (*Bettencourt*, at p. 1117.) "Under the allegations of plaintiffs' complaints, which we must accept as true, Hennessy's 'product was intended to be used with another product *for the very activity that created a hazardous situation.*'. . ." (*Ibid.*, citing *O'Neil*, *supra*, 53 Cal.4th at p. 361, original italics.) Hennessy bears some direct responsibility because its product substantially contributed to the harm. (*Ibid.*) Therefore, the court concluded that "[l]ike our colleagues in Division One, we hold that plaintiffs' 'allegations satisfy the circumscribed parameters of liability articulated by the Court of Appeal in *Tellez-Cordova* and approved by the Supreme Court in *O'Neil.*'. . ." (*Bettencourt*, at p. 1112, citing *Shields*, *supra*, 205 Cal.App.4th at p. 798.)

The most recent case to address Hennessy's liability is *Sherman*. (*Sherman*, *supra*, 237 Cal.App.4th 1133.) The Second District reversed an award of summary judgment in favor of Hennessy. Plaintiffs asserted claims for negligence, strict liability and loss of consortium. (*Id.* at p. 1137.) Plaintiffs alleged that Hennessy sold grinders whose "sole function" was to abrade asbestos-containing brake linings, and asbestos dust was released when the grinders were used. (*Ibid.*) Hennessy argued that it could not be held liable under *O'Neil* unless the machines' sole intended purpose was to abrade asbestos-containing brake linings, and plaintiffs did not raise a triable issue of fact because the undisputed evidence showed that non-asbestos brakes were available during the relevant time period. (*Sherman*, at p. 1138.)

The evidence presented in *Sherman* is strikingly similar to the evidence presented by Hennessy in this case. Hennessy relied on the declaration of an industrial safety expert, Dennis Bridge, and Craig Mountz, a Hennessy engineer. (*Sherman*, *supra*, 237

Cal.App.4th at p. 1144.) Bridge stated that non-asbestos brake linings were available in the 1960's and 1970's for popular "muscle" cars and some passenger cars. (*Ibid.*) Mountz stated that the grinders were designed to work on any type of brake, regardless of whether it contained asbestos. (*Ibid.*) Hennessy manufactured different abrasives "to better tailor" the machine to certain metallic and high performance brake linings. (*Ibid.*) Hennessy maintained that during the time Sherman worked with its grinders, there were non-asbestos brakes available and being used. (*Id.* at pp. 1144-1145.)

Sherman presented evidence that during the 1960's and 1970's brake linings "almost universally" contained asbestos. (*Sherman*, *supra*, 237 Cal.App.4th at p. 1145.) Like Rondon in this case, Sherman submitted the declaration of an industrial safety expert who explained that as late as 1986, 90 to 95 percent of brake linings contained asbestos. (*Id.* at p. 1145.) In 1973, Hennessy began offering an asbestos dust collection system with its grinders along with a warning label that "brake lining materials contain asbestos." (*Id.* at p. 1146, original capitalization omitted.)

The Second District limited its analysis to whether the Hennessy grinder "contributed substantially to the harm." (*Sherman*, *supra*, 237 Cal.App.4th at pp. 1146-1147.) A duty is imposed when " 'the intended use of a product *inevitably* creates a hazardous situation,' but not when that situation is merely foreseeable and is due solely to another product." (*Id.* at p. 1147, quoting *O'Neil*, *supra*, 53 Cal.4th at pp. 361-362, original italics.) The court concluded that Hennessy's grinders were designed to abrade brake linings for passenger cars and light trucks, "the vast majority of which contained asbestos from the 1960's to the mid-1970's." (*Sherman*, at p. 1147.) Hennessy even began to market an asbestos dust collection system because asbestos brakes were "near universal." (*Ibid.*) The grinder necessarily produced dust in its intended use which made it "virtually inevitable that the average user would be exposed to hazardous asbestos dust." (*Id.* at p. 1148.) "[T]he machine was intended to be used with drum brake linings 'for the very activity' that generated the asbestos dust, the creation of which was 'inevitabl[e]'—rather than merely foreseeable—due to the overwhelming prevalence of asbestos-containing linings. . . ." (*Ibid.*, fn. omitted.)

12

The court rejected Hennessy's argument that its grinders were meant to abrade any brake lining regardless of the composition, and that the *Tellez-Cordova* exception applied when a product can *only* be used in an injury-producing manner. (*Sherman*, *supra*, 237 Cal.App.4th at p. 1148.) "We find the relevant question not whether asbestos-containing brake linings were necessary to the operation of [Hennessy's] machine, as Hennessy maintains, but whether someone using the grinder as intended during the period in question would invariably have been subjected to asbestos dust. On this record, the answer is 'yes.'" (*Id.* at p. 1149.) Sherman's use of the machine " 'for the very activity that created a hazardous situation' was not merely possible, but inevitable . . . ." (*Ibid.*, quoting *O'Neil*, *supra*, 53 Cal.4th at p. 361.) The court further considered the policy rationale underlying *Tellez-Cordova*, and the fact that Hennessy derived an economic benefit from the use of its machines with asbestos-containing brakes. Because a manufacturer derives an economic benefit from use of its product with certain other products, "the combined use of the tool with those products inevitably created a hazardous condition, [thus] it was fair to require the tool manufacturer to share liability for the resulting injuries." (*Sherman*, at p. 1149.) Finally, the court found there was a triable issue of fact as to whether the brake linings emitted asbestos fibers in the absence of grinding. (*Id*. at p. 1152.) Therefore, summary judgment was improperly granted. (*Ibid*.)

We agree with the Second District and conclude that *O'Neil* does not require "exclusive use," but rather requires "inevitable use." (*Sherman*, *supra*, 237 Cal.App.4th at p. 1149.) *O'Neil* does not use the term exclusive use; it mentions inevitable use: "Where the *intended use* of a product *inevitably* creates a hazardous situation, it is reasonable to expect the manufacturer to give warnings." (*O'Neil*, *supra*, 53 Cal.4th at p. 361, italics added.) The *O'Neil* court mentioned the concept of a "sole purpose" when distinguishing *Tellez-Cordova*. (*O'Neil*, at p. 361.) The court stated that unlike the pumps and valves, the power tools in *Tellez-Cordova* could only be used in an injury-producing manner. "Their *sole purpose* was to grind metals in a process that *inevitably produced* harmful dust." (*Ibid.*, italics added.) *Shields* and *Bettencourt* echo this "sole

use" concept but only to the extent they are accepting the language used in the allegations of the complaint. Both cases conclude the plaintiffs' allegations that the grinders' "sole" use was to grind asbestos-containing brakes is sufficient to satisfy *O'Neil*. (*Shields*, *supra*, 205 Cal.App.4th 782; *Bettencourt*, *supra*, 205 Cal.App.4th 1103.) But neither case holds that a finding of sole or exclusive use is necessary under *O'Neil*.

The question then becomes: If "virtually all" brake linings during the relevant time period contained asbestos which resulted in Hennessy's machines being used 95 or 99 percent of the time to grind brakes producing asbestos dust, did the intended use of the product inevitably create a hazardous situation? Faced with nearly identical facts, the Second District answered "yes." (*Sherman*, *supra*, 237 Cal.App.4th 1133.) The record here reflects that although there were non-asbestos brakes available, they were only in limited use on high performance and "muscle" cars in the 1960's and 1970's. Hennessy's machines could be used on non-asbestos brakes and Hennessy produced different abrasives tailored to non-asbestos brake linings, but given that the vast majority of brakes contained asbestos, we conclude the "normal operation" of the grinders inevitably caused the release of asbestos dust. This is contrasted with *O'Neil*, where the court held that normal operation of the manufacturer's pumps and valves did not inevitably release asbestos dust. This was true even if "normal operation" was defined broadly to include repair and maintenance. (*O'Neil*, *supra*, 53 Cal.4th at p. 361.) Nothing about the pumps and valves caused the release of dust. Here, the normal operation of Hennessy's machines was to grind brakes and release asbestos dust. Its "intended use was for an activity known to Hennessy to pose an unreasonable risk of harm." (*Shields*, *supra*, 205 Cal.App.4th at p. 797.)

The facts here are more akin to *Tellez-Cordova* because the action of the grinders caused the release of asbestos dust from the brakes. The hazard was created from the use of the products together. (*Shields*, *supra*, 205 Cal.App.4th at p. 797.) Unlike the pumps and valves in *O'Neil*, the grinders here contributed to the hazard by releasing the asbestos dust from the brake linings. "[Hennessy's] machine's role in the creation of the relevant hazardous condition was not merely foreseeable, but intended and contributed

14

substantially to the condition itself. Similarly, unlike the pumps and valves in *O'Neil*, which did not cause the release of asbestos fibers, here, it was the grinding action of [Hennessy]'s machine that generated the release of harmful asbestos dust." (*Sherman*, *supra*, 237 Cal.App.4th at p. 1148, fn. 4.)

The *Sherman* court rejected Hennessy's argument that the *Tellez-Cordova* exception only applied when a product can *solely* be used in an injury-producing manner. (*Sherman*, *supra*, 237 Cal.App.4th at pp. 1148-1149.) "We find the relevant question not whether asbestos-containing brake linings were necessary to the operation of [Hennessy]'s machine, as Hennessy maintains, but whether someone using the grinder as intended during the period in question would invariably have been subjected to asbestos dust." (*Id.* at p. 1149.) The court concluded that use of the machine " 'for the very activity that created a hazardous situation' was not merely possible, but inevitable . . . ." (*Ibid.*, quoting *O'Neil*, *supra*, 53 Cal.4th at p. 361.)

The *Sherman* court found that Hennessy grinders were designed for passenger cars and trucks, "the vast majority of which contained asbestos from the 1960's to the mid-1970's." (*Sherman*, *supra*, 237 Cal.App.4th at p. 1147.) Also, Hennessy began to market an asbestos dust collection system in 1973 because asbestos-containing brakes were "near universal." (*Ibid.*) The grinders necessarily produced dust in their intended use, which made it "virtually inevitable that the average user would be exposed to hazardous asbestos dust." (*Id.* at pp. 1147-1148.)

We are further persuaded by the policy argument advanced in *Sherman*. Because a manufacturer derives an economic benefit from use of its product with certain other products, and "the combined use of the tool with those products inevitably created a hazardous condition, it was fair to require the tool manufacturer to share liability for the resulting injuries." (*Sherman*, *supra*, 237 Cal.App.4th at p. 1149.) The policy rationale underlying *Tellez-Cordova* was that if a manufacturer's product contributed to the hazardous situation, the manufacturer should be held liable. The combined use of Hennessy's machines with the asbestos-containing brakes inevitably created a hazardous condition by releasing asbestos fibers into the air. Hennessy was in a position to provide

15

safeguards from this exposure. Hennessy's ability do to this is evidenced by the addition of asbestos dust collectors to all machines in 1973. Rondon should therefore be given the opportunity to prove that Hennessy shares liability for injuries resulting from the hazardous condition created by the use of its grinders in the 1960's and 1970's.

**C.** *Negligence*

The existence of a duty of care is a legal question for the court. (*Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564, 593.) The question before us is the same as posed in *O'Neil*: whether a manufacturer owes a duty of care to prevent exposure posed by another manufacturer's product. (*O'Neil*, *supra*, 53 Cal.4th at pp. 364-365.)

*Bettencourt* held the plaintiffs had stated a cause of action for negligence because strict liability and negligence parallel and supplement each other. (*Bettencourt*, *supra*, 205 Cal.App.4th at p. 1118.) The same policy considerations that militate in favor of the imposition of strict liability apply with equal force to negligence. (*Ibid.*) "Because plaintiffs state a cause of action for strict liability under the rules announced in *O'Neil*, we likewise find their allegations sufficient to state a cause of action for negligence." (*Bettencourt*, at p. 1118.)

Under *O'Neil*, a product manufacturer may be liable for the harm caused by another product where the manufacturer's product contributes substantially to the harm. (*O'Neil*, *supra*, 53 Cal.4th at p. 362.) In *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*), our Supreme Court set forth the principal factors we must weigh in determining the existence of a duty, including: (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered injury, (3) the closeness of the connection between the defendant's conduct and the injury suffered, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and (7) the availability, cost, and prevalence of insurance for the risk involved. (*Id.* at p. 113; see also *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771.)

16

In light of our analysis of the strict liability issue, we conclude that there is also a triable issue as to negligence. We will, however, briefly review the *Rowland* factors as they apply here.

Rondon stresses the first factor: The foreseeability of the risk Hennessy's grinders posed to mechanics using them. The recognition of a legal duty of care " ' "depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability." '. . ." (*O'Neil*, *supra*, 53 Cal.4th at p. 364, quoting *Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1072.) In *O'Neil*, the court held it was not foreseeable that the plaintiff, who worked around the manufacturer's pumps and valves more than 20 years later would develop an injury nearly 40 years after his workplace exposure. (*O'Neil*, at p. 365.) Here, the intended use of the grinders was to grind brake linings, the vast majority of which contained asbestos. Hennessy knew the normal and intended use of its grinders released asbestos dust. The "alleged injuries were not unforeseeable merely because Hennessy's brakeshoe [*sic*] grinding machines did not themselves contain asbestos." (*Bettencourt*, *supra*, 205 Cal.App.4th at p. 1118.) Hennessy is liable for the design and warning defects of its own product which produced harmful asbestos dust during normal use in grinding brake linings. (See *id.* at pp. 1118-1119.) We conclude it was foreseeable the average user would be exposed to asbestos dust.

Hennessy does not dispute the second factor that Rondon's death was caused by mesothelioma from exposure to asbestos, but argues the third factor that connection between Hennessy's conduct and Rondon's injuries is remote. Rondon used Hennessy's arcing machines beginning in 1965 when "virtually all" brake linings contained asbestos. (Contrast *Taylor v. Elliott Turbomachinery Co., Inc.*, *supra*, 171 Cal.App.4th at pp. 594-595, original italics ["Respondents' allegedly culpable conduct is the failure to warn of a danger arising from *other* manufacturer's products *two decades* after respondents delivered their products to the Navy. Any connection between respondents' conduct and Mr. Taylor's injury is thus highly attenuated."].) The connection here is not

17

attenuated, the ordinary use of Hennessy's machines exposed Frank Rondon to asbestos dust contributing to his injuries.

The fourth factor is moral blame. While Hennessy did not manufacture an asbestos product, it knew for decades that its machines, when used as intended, would release hazardous asbestos dust into the air. When required by regulations in 1973, Hennessy provided asbestos dust collectors and warnings about asbestos dust on all machines. Hennessy, therefore, should bear some level of responsibility for the asbestos exposure caused by use of it is grinders which could have been reduced or prevented by warnings or added safety features.

As to the fifth factor, whether imposing a duty of care could prevent future harm, Hennessy had the ability to lessen the harm from use of its grinders. In *O'Neil*, the court concluded "[t]here is no reason to think a product manufacturer will be able to exert any control over the safety of replacement parts or companion products made by other companies." (*O'Neil*, *supra*, 53 Cal.4th at p. 365.) Here, Hennessy could have exerted control over the safety of its machines by providing an asbestos dust collection system (prior to 1973) and providing warnings. Hennessy may not have been able to control the types of brakes manufactured by other companies, but it could ensure that its machines were more safely used with any type of brake. "Hennessy is not being asked to 'insure against products over which [it has] no control'. . . . [P]laintiffs seek to hold Hennessy liable for design and warning defects in Hennessy's own product, not the products of others." (*Bettencourt*, *supra*, 205 Cal.App.4th at p. 1118.)

The sixth factor is the burden on defendant and consequences for imposing a duty of care. "Even when foreseeability was present," our Supreme Court has "declined to allow recovery on a negligence theory when damage awards threatened to impose liability out of proportion to fault or to promote virtually unlimited responsibility for intangible injury." (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 398.) Mesothelioma caused by direct exposure to asbestos being released by the use of Hennessy grinders does not extend liability to an unlimited number of individuals.

Imposing such a duty undoubtedly creates a burden on Hennessy, but this burden is not out of proportion to its fault in creating the harm.

The final factor is the availability and cost of insurance for the risk involved. This factor counsels against finding a duty of care where a manufacturer must insure against the " 'unknowable risks and hazards' lurking in every product that could possibly be used with or in the manufacturer's product. [Citation.]" (*O'Neil*, *supra*, 53 Cal.4th at p. 365.) Here, however, Hennessey knew that its grinders were designed to be used almost exclusively with asbestos-containing brake linings. It was not faced with an unknowable risk or hazard.

Our conclusion that a duty exists in this case is not the equivalent of a finding of negligence against Hennessy. (See *Cabral v. Ralphs Grocery Co.*, *supra*, 51 Cal.4th at p. 772 [noting the "crucial distinction" between a determination that the defendant owed the plaintiff a duty of ordinary care, "which is for the *court* to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the *jury* to make" (original italics)].) We, however, conclude there are factual issues to be resolved by the trial court.[3]

## IV.

## DISPOSITION

The judgment is reversed.

---

[3] Given our disposition, we need not reach Rondon's claims that the trial court improperly excluded (1) the 2012 deposition of Craig Mountz in *Caffrey v. Armstrong International, Inc.* in Madison County, Illinois, Circuit Court (Case No. 11 L 1335) and (2) the 2008 deposition of Craig Mountz in *Ornstein v. Alfa Laval, Inc.* Los Angeles County Superior Court (Case No. BC388810) in ruling on Hennessy's summary judgment motion.

The two deposition transcripts from the prior cases are largely duplicative of Mountz's declaration and deposition in this case and, as both parties agree, were not necessary to decide the issues before us on appeal. Our review of the evidence was limited to the items found admissible by the trial court.

_____

RUVOLO, P. J.

We concur:

_____

RIVERA, J.

_____

STREETER, J.

## COURT OF APPEAL, FIRST APPELLATE DISTRICT
### 350 MCALLISTER STREET
### SAN FRANCISCO, CA 94102
### DIVISION 4

RENEE RONDON,
Plaintiff and Appellant,
v.
HENNESSY INDUSTRIES, INC.,
Defendant and Respondent.

A141686
Alameda County No. RG13695174

BY THE COURT:


Good cause appearing, the request filed on May 27, 2016 by appellant Renee Rondon to publish this court's May 9, 2016 opinion is granted.

The May 9, 2016 opinion is now certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and the opinion shall be published in the official reports.

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Jo-Lynne Q. Lee |
| Counsel for Appellant: | Kazan, McClain, Satterley & Greenwood, |
| | Ted W. Pelletier and Michael T. Stewart |
| Counsel for Respondent: | Gordon & Rees, Don Willenburg and |
| | Mitchell B. Malachowski |

A141686, A142411, *Rondon v. Hennessy Industries, Inc.*