Filed 9/15/16  Taite v. City of Long Beach CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NONA TAITE, | B265240 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC515864) |
| CITY OF LONG BEACH, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michelle R. Rosenblatt, Judge. Affirmed.

Jeffrey Alan Sklar for Plaintiff and Appellant.

Charles Parkin, City Attorney, Howard D. Russell and Victoria Silcox, Deputy City Attorneys, for Defendant and Respondent.

* * * * * *

Nona Taite (plaintiff) resigned "for personal reasons" from her job as a trainee public safety dispatcher a week before her final training benchmark, a benchmark she later admitted she would not have met. Plaintiff sued her employer for (1) racial discrimination, (2) harassment, (3) retaliation, and (4) failure to investigate a complaint of protected activity. The trial court granted summary judgment to plaintiff's employer. We conclude this was correct, and affirm.

## FACTS AND PROCEDURAL HISTORY

### I.      Facts

#### A.      *Dispatch training program*

In March 2011, the City of Long Beach (City) hired plaintiff and four others as Public Safety Dispatchers I, which is a probationary, trainee position. Plaintiff's class of trainees consisted of three Black trainees (including plaintiff), one Hispanic trainee, and one White trainee. The White trainee and one of the Black trainees (other than plaintiff) had previous experience as a dispatcher.

The City's dispatcher training program is rigorous. City dispatchers are tasked with taking incoming 911 calls and dispatching police officers and fire fighters to assist callers. To impart the skills necessary for this job, the City requires its trainees to attend classroom training followed by nine months of hands-on training where the trainees answer 911 calls and dispatch field officers while being shadowed and supervised by the communications training officer (CTO) assigned to them. A CTO assists his or her trainee with calls and dispatches, and also documents the trainee's performance in weekly written evaluations that rate the trainee's performance numerically (on a scale of one to four) and with narrative comments. To progress through this training program, trainees are required to successfully meet five skill-based benchmarks of ever-increasing difficulty—at seven weeks, nine weeks, three months, six months and nine months. Only if a trainee masters the skills required at every benchmark will he or she be transitioned into "solo" status for the remaining portion of his or her one-year probationary period. Historically, only about half of the trainees achieve the final benchmark.

2

### B. *Plaintiff's CTOs and performance as a trainee*

The City's protocol is to assign trainees to different CTOs as they pass the various benchmarks, and plaintiff had four CTOs during the period of her hands-on training, which started in May 2011. Plaintiff did not consider her assignment to different CTOs to be punitive.

Plaintiff's first CTO was Sarah Day (CTO Day). Plaintiff felt that Day was a good and "fair" trainer.

After plaintiff passed the three-month benchmark, she was assigned to her second CTO, Tony Thuong (CTO Thuong). Plaintiff believed that CTO Thuong's evaluations of her were accurate and fair, but thought he was "mean," "rude" and "belittling" to her. He also occasionally "scream[ed] at her." Plaintiff complained about CTO Thuong's demeanor to Leslie Griggs (Griggs), who oversaw the supervision of all trainees, and Griggs assigned plaintiff to a new CTO.

Plaintiff's third CTO was Julie Kahai (CTO Kahai). Plaintiff felt she had a "good" relationship with CTO Kahai.

After passing her six month benchmark, plaintiff was assigned to CTO Sarah Stephenson (CTO Stephenson). Plaintiff described CTO Stephenson as a "very high intens[ity]" person who would bounce her leg, hit tables with her hand, and yell. Plaintiff felt CTO Stephenson was "disrespectful," "condescending" and "belittling," although plaintiff did not know whether CTO Stephenson treated all of her trainees the same way. Plaintiff complained about CTO Stephenson, and was moved to a different CTO a few weeks before the nine-month benchmark.

Plaintiff was reassigned to her first CTO, CTO Day. Although plaintiff stated in her interrogatory answers that, in this second assignment to CTO Day, CTO Day treated her "as cruelly as [CTO] Thuong and [CTO] Stephenson," plaintiff subsequently testified at her deposition that her interrogatory answers were wrong and that CTO Day treated her "fairly" and was an "okay" CTO.

The four CTOs' evaluations of plaintiff's performance were largely consistent. All of the CTOs, including CTO Thuong and CTO Stephenson, reported in their

3

evaluations that plaintiff had a good attitude and competently received 911 calls and ordered dispatches when the call volume was slow. All of the CTOs also reported several areas where plaintiff's skills were lacking. Their chief concern was that plaintiff made numerous mistakes in receiving calls and in dispatching officers whenever the call volume was anything but slow due to her failure to listen carefully, her poor typing skills, her tendency to document irrelevant call details, and her inability to multi-task. Plaintiff also lacked a mastery of the City's geography necessary to dispatch public safety officials efficiently. CTO Stephenson and CTO Day reported that plaintiff's inability to keep up with heavier call volume posed a public safety risk to the officers she dispatched. These very same deficiencies were also noted by CTOs who evaluated plaintiff when her assigned CTO was absent, by field officers who called in to complain about poorly handled dispatches, and by plaintiff herself, who acknowledged that her performance was not "exemplary" and that she was not "ready to go solo" by the time of her nine-month benchmark.

None of plaintiff's CTOs ever made any comments to her about her race. On one occasion, CTO Thuong told plaintiff that he had in the past been teased about his Asian accent. Although plaintiff later said she viewed CTO Thuong's comment "in my mind indirectly" as a comment on people not liking her because she is Black, plaintiff never complained to the City's human resources department about any racial bias or mistreatment despite being trained on how to report such matters.

### C. Changes in trainee evaluation procedures

In the midst of plaintiff's time as a trainee, Lieutenant Kenneth Rosenthal (Lt. Rosenthal), who oversaw the entire dispatcher training program, reviewed plaintiff's weekly evaluations. He noted a fundamental "inconsisten[cy]" between the scores and narrative comments in plaintiff's evaluations that identified plaintiff's deficient performance on the one hand, and her CTOs' willingness to pass her through the benchmarks despite those deficiencies and without following up on them. To ensure that the trainees' progress through the program better matched their evaluation scores, Lt. Rosenthal in November 2011 ordered several changes to how all CTOs were to supervise

4

their trainees: (1) CTOs were to conduct daily evaluations rather than weekly evaluations; (2) CTOs were to attach the actual call reports to their evaluations rather than merely summarizing them; and (3) CTOs were to focus on the weak areas of performance rather than on giving positive feedback. Lt. Rosenthal also declared that trainees were no longer allowed to write comments on their own evaluations and would be penalized for asking their CTO the same question twice. Despite these new rules, CTO Stephenson and CTO Day continued to give plaintiff positive feedback on her evaluations and allowed her to write comments on her evaluations. At the time Lt. Rosenthal's changes took effect, only the three Black trainees in plaintiff's class remained because the Hispanic trainee had dropped out and the White trainee had been "solo'ed out" early.

### D. *Plaintiff's resignation*

Plaintiff's nine-month benchmark was scheduled for February 4, 2012. Just six days before, on January 29, 2012, plaintiff resigned from her job, citing "personal reasons."

## II. Procedural History

### A. *Complaint*

In the operative first amended complaint, plaintiff sued the City for violating the Fair Employment and Housing Act (FEHA). (Gov. Code, § 12940 et seq.) Specifically, she alleged claims for (1) racial discrimination, (2) harassment, (3) retaliation, and (4) failure to investigate a protected complaint.

### B. *Motion for summary judgment*

The City filed a motion for summary judgment.

Plaintiff opposed the motion, relying primarily on evidence adduced in three other FEHA lawsuits brought against the City—by Griggs and by the two other Black trainees in her class—and that the parties stipulated could be used in plaintiff's case.

The admissible evidence plaintiff proffered in opposition to summary judgment falls into three broad categories.

5

First, plaintiff submitted evidence of conduct by Lt. Rosenthal—namely, that (1) Sherriel Murry (Murry), the City's senior human resources officer and Griggs's friend, believed that Lt. Rosenthal is a "bigot" based on what she has heard from others who say he is two-faced, even though Murry has never heard him use racial epithets or seen him treat White people better than Black people; (2) when Griggs asked Lt. Rosenthal why she was made training supervisor, he told her to "go home and look in the mirror"; (3) Lt. Rosenthal did not give Griggs a further promotion when Griggs scored higher than the other candidates, and instead ordered a second round of interviews in which Griggs was scored less favorably; (4) Lt. Rosenthal once called Griggs a "bitch"; (5) Lt. Rosenthal once got off of the phone with one of the Black trainees and told Griggs, "I don't think he's gonna make it"; (6) Lt. Rosenthal ordered CTO Dave Barrow to write a memo detailing Barrow's concerns that Griggs was favoring Black trainees, and Barrow ended that memo by stating, "I hope this is what you wanted. I need to go take a shower now" and later explained that the contents of his memo were true but that he was upset with Lt. Rosenthal for making him put his concerns in a written memo rather than allowing him to report them informally; (7) Lt. Rosenthal ordered CTO Stephenson to reduce plaintiff's numerical scores on her January 2, 2012 evaluation; and (8) Lt. Rosenthal once asked plaintiff what she and Griggs (who was on medical leave at the time) were discussing in the parking lot when, in actuality, plaintiff had been talking with her own sister.

Second, plaintiff cited conduct by some of the City's CTOs—namely, that (1) CTO Jason Hunter had joked about Black and Samoan last names; (2) CTO Stephenson once told another Black trainee that the trainee did not want to sound "like" plaintiff because "other officers" had commented that plaintiff sounded too "ethnic," although CTO Stephenson did not agree with those comments; (3) CTO Hunter and CTO Eileen Rodriguez told her that they "had a problem" with her personalized license plate, which read "♥BNBLQ" (presumably code for "Love Being Black"); and (4) one of the Black trainees suing the City felt that some unnamed CTOs were cliquish and less friendly to Black employees.

6

Lastly, plaintiff cited CTO Michelle Johnson's statement that CTO Barrow had once mimicked Black callers in a derogative fashion, although one of CTO Barrow's Black trainees said CTO Barrow was "very supportive" and "very good" as his CTO.

## C.     Trial court's ruling

In an eight-page tentative ruling, which the trial court subsequently adopted as its final ruling, the court granted summary judgment to the City on all of plaintiff's claims.

The court granted summary judgment on plaintiff's racial discrimination claim because she had not established two elements of a prima facie case of discrimination—namely, that (1) she suffered an adverse employment action, and (2) the City acted with a discriminatory motive. The court rejected plaintiff's argument that she was constructively discharged by the City, relying upon the undisputed facts that plaintiff's performance was below what was needed to pass the upcoming and more difficult nine-month benchmark, that there was no indication that the City was planning to fire her, and that Lt. Rosenthal's November 2011 changes to the trainee evaluation procedures had no effect on plaintiff's scores as her evaluations before and after those changes were "on par" with one another. The court also rejected plaintiff's further arguments that she suffered any lesser adverse employment action: It was undisputed that plaintiff was not yet eligible for a promotion, so the City's failure to promote her was not actionable; it was undisputed that plaintiff's transfers to different CTOs were common practice and, in two instances, requested by plaintiff herself; and it was undisputed that Lt. Rosenthal's new procedures, as noted above, had no effect on plaintiff's evaluations. The court further concluded that, even if plaintiff's resignation were considered a constructive discharge, that plaintiff had not adduced substantial evidence to show that the City's concerns about plaintiff's inability to master the skills necessary to be a "solo" dispatcher were pretextual. Specifically, the court explained that Murry's personal belief that Lt. Rosenthal is a bigot was "unconnected to [any] decision making," and that none of the CTOs who made racially derogatory comments were ever *plaintiff's* CTO.

The court granted summary judgment on plaintiff's remaining claims. The court rejected plaintiff's harassment claim because neither of the CTOs who allegedly harassed

7

her (CTO Thuong and CTO Stephenson) ever made racial comments. Because plaintiff's objection was to "supervisor's training styles, not harassment," there was no racially driven harassment. The court rejected plaintiff's retaliation claim because plaintiff at no time lodged any complaint regarding racial discrimination or harassment and the City consequently had no reason to retaliate against her. The court discarded as legally unfounded plaintiff's argument that the City "should have known" that her complaints about two of her CTOs "went to discrimination." The court was also unpersuaded that the departure of all three Black trainees was evidence of retaliation. For the same reason, the court rejected defendant's claim that the City failed to investigate a FEHA complaint that plaintiff never made.

### D. *Judgment and appeal*

After the trial court entered judgment for the City, plaintiff filed a timely appeal.

## DISCUSSION

Plaintiff argues that the trial court erred in granting the City's motion for summary judgment.

A party is entitled to summary judgment if it can "show that there is no triable issue as to any material fact and that [it] is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) The party moving for summary judgment must show either that the opposing party cannot establish "[o]ne or more of the elements of [her] cause of action" or by showing a valid affirmative defense. (Code Civ. Proc., § 437c, subds. (o) & (p)(2).) If the moving defendant meets this initial showing, the burden shifts to the plaintiff to present evidence showing that a triable issue of material fact(s) exist. (*Rodriguez v. E.M.E., Inc.* (2016) 246 Cal.App.4th 1027, 1032.) "A triable issue of material fact exists if, and only if, the evidence reasonably permits the [court] to find the contested fact in favor of the plaintiff in accordance with the applicable standard of proof." (*Rondon v. Hennessy Industries, Inc.* (2016) 247 Cal.App.4th 1367, 1374.) We review a trial court's grant of summary judgment de novo. (*Burgueno v. Regents of University of California* (2015) 243 Cal.App.4th 1052, 1057.)

8

In evaluating a motion for summary judgment on appeal, we consider only the evidence the trial court considered unless we conclude that the trial court erred in its evidentiary rulings. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 526-527). In this case, plaintiff's briefs on appeal rely in part on evidence that the trial court excluded. Plaintiff has ignored the trial court's evidentiary rulings, and has done so by not mentioning those rulings in her briefs and by not including in the record on appeal the court's tentative ruling containing those rulings or its subsequent order adopting the tentative ruling as its final ruling. We take judicial notice of the trial court's orders. (Evid. Code, §§ 452 & 459.) Because plaintiff does not attack the court's evidentiary rulings (*Dina v. People ex rel. Dept. of Transportation* (2007) 151 Cal.App.4th 1029, 1048 [failure to object on appeal leaves evidentiary ruling intact]), we will not consider the following items of excluded evidence: (1) Murry's summary of Griggs's statement that Lt. Rosenthal told Griggs that he did not want plaintiff to pass probation (because it was admitted for its effect on Murry, not for its truth); (2) Griggs's opinion that Lt. Rosenthal's comment about the Black trainee not "mak[ing] it" was based on the sound of the trainee's voice (because that opinion was speculative); (3) Griggs's opinion that Lt. Rosenthal ordered a second round of interviews for her promotion due to Griggs's race (because that opinion was speculative); and (4) Lt. Rosenthal's dismissal of the idea of "solo'ing" out one of the other Black trainees early (because it was irrelevant).[1] The court's evidentiary rulings are not an abuse of discretion in any event. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852.)

---

[1] The trial court at one point appears to exclude *all* evidence adduced from discovery in the cases involving Griggs and the other two Black trainees, but this ruling is inconsistent with the parties' stipulation to rely upon this evidence and with the court's subsequent citation in its opinion and during its oral argument to this very same evidence. In light of this uncertainty, we will treat this evidence as generally admitted absent any specific exclusion.

## I. Discrimination

Among other things, FEHA makes it unlawful "[f]or an employer, because of . . . race . . . to discriminate against [a] person in compensation or in terms, conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a); *Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 122.) In evaluating such claims, California uses a burden-shifting mechanism. The plaintiff-employee must first establish a prima facie case of discrimination by producing evidence to show that "(1) [s]he was a member of a protected class, (2) [s]he was qualified for the position [s]he sought or was performing competently in [her] position . . ., (3) [s]he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 (*Guz*).) If she meets this burden, it is rebuttably presumed that the employer engaged in discrimination and the burden shifts to the employer to set forth a legitimate, nondiscriminatory reason for the "adverse employment action" the plaintiff-employee suffered. (*Id.* at pp. 355-356, 361; *Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 964-965.) Once the employer sets forth such a reason, the presumption disappears and the burden shifts back to the plaintiff-employee to "'"produc[e] substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action."'" (*Swanson*, at p. 965, quoting *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1529.)

### A. Adverse employment action

Plaintiff first attacks the trial court's conclusion that she did not establish, as part of her prima facie case, that she was subjected to any "adverse employment action." Plaintiff asserts that she was (1) constructively discharged, (2) not promoted, (3) transferred among various CTOs, and (4) subject to Lt. Rosenthal's new evaluation procedures.

10

An employee who resigns will be treated as being constructively discharged by her employer if she demonstrates that her resignation was "*employer*-coerced, [and] not caused by the voluntary action of the employee or by conditions . . . beyond the employer's reasonable control." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1248.) Thus, "[i]n order to establish a constructive discharge, an employee must plead and prove . . . that [her] employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Id.* at p. 1251; accord, *Vasquez v. Franklin Management Real Estate Fund, Inc.* (2013) 222 Cal.App.4th 819, 826.) "'[S]ingle, trivial, or isolated acts'" are generally not sufficient to support a finding of constructive discharge. (*Turner*, at p. 1247; *Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1056.) Whether the conditions were so intolerable as to justify an employee's decision to resign is normally a question of fact, but summary judgment may be appropriate where the plaintiff-employee's decision to resign is unreasonable as a matter of law. (*Vasquez*, at p. 827.)

Plaintiff points to several working conditions that she claims were "intolerable or aggravated." First, she argues that CTO Thuong and CTO Stephenson treated her poorly. However, plaintiff admits that neither CTO made racially charged comments, plaintiff never proved that they had a different demeanor with their other trainees, their evaluations of plaintiff were equivalent to the evaluations of the CTOs she liked, and plaintiff was moved to different CTOs once she complained about their demeanor. Second, plaintiff argues that Lt. Rosenthal changed the evaluation procedures, but those changes affected *all* of the remaining trainees and did not affect plaintiff's evaluation scores, which remained relatively the same both before and after the changes. Third, plaintiff argues that other CTOs made racially disparaging comments, and that CTO Thuong once commented about being ridiculed for his Asian accent. However, plaintiff introduced no evidence that she was aware of the other CTOs' disparaging comments, and such comments could not have affected *plaintiff's* working conditions if she did not

11

know about them. What is more, CTO Thuong's single comment was a one-time occurrence that had no link to plaintiff or her race. Fourth, plaintiff recites that Lt. Rosenthal ordered CTO Stephenson to change the numerical scores on her January 2, 2012 evaluation of plaintiff, but this was a single occasion that was ameliorated by CTO Stephenson's subsequent evaluations giving plaintiff higher ratings and by plaintiff's subsequent transfer back to CTO Day. Even taken together, the incidents plaintiff points to do not amount to working conditions that a reasonable person would find "intolerable or aggravated." Plaintiff's decision to resign was not the product of employer coercion, but rather the product of being days away from a benchmark deadline she later admitted she would not have passed.

Nor was plaintiff subjected to other adverse employment actions. FEHA prohibits adverse employment actions short of discharge if they are "reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1053-1054 (*Yanowitz*).) The actions plaintiff cites do not meet this definition. Plaintiff asserts she was not promoted, but frankly admitted she lacked the skills to satisfy the nine-month benchmark needed for promotion. Plaintiff notes that she was transferred among four different CTOs, but this was common practice, plaintiff requested two of the transfers, and plaintiff's evaluations remained relatively the same no matter who was serving as her CTO. Plaintiff finally points to the implementation of Lt. Rosenthal's new evaluation procedures, but these changes affected *all* trainees from that point forward and also did not alter plaintiff's performance or her CTOs' evaluations of her performance.

### B. Discriminatory motive

Plaintiff also attacks the trial court's ruling that she did not make a prima facie showing of discriminatory motive. Even if we assume plaintiff made this showing, as our Supreme Court has observed, "an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz, supra*, 24 Cal.4th at p. 361.)

12

It is undisputed that none of plaintiff's four CTOs ever said anything to her that was racially derogatory and that her evaluation scores were consistent across CTOs and were consistently declining as she neared the final and most difficult benchmark. Plaintiff directs us to three categories of evidence that, in her view, nevertheless justify a rational inference that the City's treatment of her was motivated by racial discrimination.

First, she cites Murry's opinion that Lt. Rosenthal is a "bigot," and argues that Murry's opinion is effectively a binding admission of discriminatory animus in light of the City's designation of Murry as a "person most knowledgeable" in the other pending racial discrimination cases. As the trial court noted during the hearing on the summary judgment motion, Murry's opinion is entitled to little or no weight because it is "not supported" by anything Murry personally observed and because it is based solely on the view of others that Lt. Rosenthal is "two-faced," even though Murry has never heard him make racial slurs or treat Black persons less favorably than others. Even if Murry's opinion had any basis, FEHA "does not purport to outlaw discriminatory thoughts [or] beliefs" (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 231), and there was no evidence that Lt. Rosenthal's "two-faced" personality that never before prompted him to treat Blacks differently was connected in any way to his decision to implement changes to the evaluation procedures or order CTO Stephenson to modify one of plaintiff's daily evaluation ratings. Nor does Murry's status as a person most knowledge somehow transform her foundationless opinion that Lt. Rosenthal is a "bigot" into a binding stipulation of discriminatory animus on behalf of the City. Plaintiff cites *O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 570-571 and *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1077-1078, but those cases deal, respectively, with the admissibility of an authorized employee's statement under Evidence Code section 1222 and an agent's authority to bind his principal. They do not support the sweeping proposition plaintiff advances.

Second, plaintiff cites several pieces of evidence of the City's discriminatory conduct against other employees, which is generally relevant as so-called "me too" evidence. (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 92, 113.) She points to Lt.

Rosenthal's comment that another Black recruit was "not gonna make it," but this comment by itself evinces no racial animus. Plaintiff also points to Lt. Rosenthal's conversation with Griggs in which she asked why she had been promoted and he responded that Griggs should "go home and look in the mirror." Although Lt. Rosenthal, by his answer, may well have been indicating to Griggs his belief that she had been given favorable treatment through a promotion due to her race, his answer does not lead to the inference that Lt. Rosenthal is willing to treat Griggs or any other Black employee *less* favorably. Indeed, neither Murry nor plaintiff ever heard Lt. Rosenthal make any racially disparaging comments. Along the same lines, Lt. Rosenthal's decision to subject the candidates for the further promotion Griggs sought to an additional round of interviews, and his statement that Griggs was a "bitch," do not reflect any racial bias. Plaintiff next notes that CTO Stephenson had told another trainee that "other officers" had commented that plaintiff sounded "too ethnic," but CTO Stephenson did not mention race and did not feel that the other officers' comments were accurate. Plaintiff cites the belief of one of the other Black trainees suing the City that some of the CTOs were cliquish and less friendly to Black employees and evidence that other CTOs had made racially disparaging remarks and commented on her personalized license plate, but there is no evidence that plaintiff worked with any of the CTOs who were cliquish and it is undisputed that none of plaintiff's CTOs said anything racially derogatory or treated her differently because of her race. Plaintiff lastly cites the fact that the White trainee was "solo'ed" out early, but at the hearing on the summary judgment motion, disavowed any notion that the White trainee "promoted out when she did because she's White."

Lastly, plaintiff cites a mélange of other, circumstantial evidence. She points to the timing of Lt. Rosenthal's decision to implement changes to the evaluation program, which occurred after the White trainee had been promoted and the Hispanic trainee had resigned, leaving only the three Black trainees remaining. However, Lt. Rosenthal contemporaneously documented his reasons for the change, those reasons are supported by the evaluations he studied in concluding that there was a mismatch between evaluations and graduation through the various benchmarks, and those reasons had

14

nothing to do with race.  Plaintiff cites the language at the end of CTO Barrow's memorandum reporting Griggs's favoritism toward Black trainees, but CTO Barrow explained that the content of his memo was accurate and that this language reflected his distaste for having to document his concerns.  Plaintiff argues that Lt. Rosenthal's mistake in believing that plaintiff was talking with Griggs rather than someone else reflects a paranoia about Black employees conspiring against him, but plaintiff acknowledged that Lt. Rosenthal might be paranoid because Griggs was supposed to have been on medical leave (and thus not supposed to be in the parking lot) at the time. Plaintiff finally cites the City's failure to investigate her complaint of racial animus (e.g., *Mendoza v. Western Medical Center Santa Ana* (2014) 222 Cal.App.4th 1334, 1344-1345 [inadequate investigation can be evidence of pretext]), but plaintiff never filed a complaint that would have put the City on notice that there was anything to investigate.

## II.     Harassment

FEHA also makes it unlawful "[f]or an employer . . . to harass an employee" "because of race."  (Gov. Code, § 12940, subd. (j)(1).)  To prevail on this claim, a plaintiff-employee must establish that "'(1) [she] belongs to a protected group; (2) [she] was subject to unwelcome [racial] harassment; (3) the harassment complained of was based on [her race]; (4) the harassment complained of was sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment.' [Citation.]"  (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1377.)  Because ""'"[h]arassment consists of conduct outside the scope of necessary job performance [citation]"'""  (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 707), "commonly necessary personnel management actions such as hiring and firing, job or project assignments, . . . promotion or demotion, [and] performance evaluations . . . , and the like" typically "do not come within the meaning of harassment" (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 64-65) unless those personnel actions "have a secondary effect of communicating a hostile message" (*Roby*, at p. 709).

15

Plaintiff argues that the trial court erred in concluding she was not subject to harassment, and cites (1) Murry's opinion that Lt. Rosenthal is a "bigot," and (2) how she was treated by CTO Thuong and CTO Stephenson. As discussed above, Murry's opinion is without foundation. More pertinent here, Lt. Rosenthal never *did anything* to or toward plaintiff that was racially harassing. He modified the evaluation procedures and ordered CTO Stephenson to change her scores on a single day's evaluation, but the first is not racially driven and the second was a one-time event and not "pervasive." Plaintiff's treatment by CTO Thuong and CTO Stephenson may have felt harassing to plaintiff, but it was not *racially* harassing for the reasons discussed above.

## III.    Retaliation

FEHA makes it unlawful "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Gov. Code, § 12940, subd. (h).) To prevail on a retaliation claim, the plaintiff-employee must prove that "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.) A claim for retaliation uses the same, three-step burden-shifting mechanism as a claim for discrimination. (*Ibid.*)

Plaintiff asserts that the trial court erred in granting summary judgment on her retaliation claim because (1) she *was* subjected to an adverse employment action, and (2) the City should have known that her complaints about CTO Thuong and CTO Stephenson were based on racial discrimination. We reject both arguments. As discussed above, plaintiff did not suffer any adverse employment action. Plaintiff's second argument rests on an misunderstanding of the pertinent law. Although a plaintiff need not file a complaint or "*explicitly* inform [her] employer that she believed [a particular action she opposed] was discriminatory," the plaintiff must nevertheless establish that the "employer *knows* that the employee's actions" were "based upon a reasonable belief that the employer was engaging in discrimination"; "an employee's

16

unarticulated belief that an employer is engaging in discrimination will not suffice." (*Id.* at p. 1046, second italics added.) Here, plaintiff's complaints about CTO Thuong and CTO Stephenson were grounded solely on their demeanor, not on anything racially derogatory that they said or did. Plaintiff also never filed a complaint. There is no evidence to support a finding that the City *knew* plaintiff's dissatisfaction with either CTO was due to the CTO's racially discriminatory behavior, and plaintiff's contention that the City "should have known" is not legally cognizable. Also, because plaintiff took no action in support of the discrimination or harassment claims brought by any of the other City employees, whether the City knew of those other employees' complaints is of no consequence.

## IV.    Failure To Investigate a Complaint

FEHA further prohibits "an employer" from "fail[ing] to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (Gov. Code, § 12940, subd. (k).) This claim is by its nature auxiliary: Without actionable discrimination, harassment or retaliation, there can be no claim for failure to prevent discrimination or harassment. (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 880.) For the reasons discussed above, plaintiff has not established sufficient evidence to create a triable issue of fact as to whether she was the victim of discrimination, harassment or retaliation. This is fatal to her failure-to-investigate claim.

### DISPOSITION

The judgment is affirmed. The City is entitled to its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
HOFFSTADT

We concur:

_____, P. J.
BOREN

_____, J.
ASHMANN-GERST

17